UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

UNITED EMPLOYMENT ASSOCIATES,  :
                          Plaintiff,      :
                                 :
         v.                    :          No. 5:23-cv-3668
                                 :
LANDMARK CONSTRUCTION     :
COMPANY, INC., and PORT CITY    :
CONCRETE, INC.,                :
                     Defendants.    :

_____

**O P I N I O N**
**Motion to Dismiss, ECF No. 27 – Granted**

**Joseph F. Leeson, Jr.**                                   **December 5, 2024**
**United States District Judge**

## I.    INTRODUCTION

This case stems from a contractual dispute between a provider of employment placement services and two businesses specializing in construction and concrete. Plaintiff United Employment Associates ("UEA") brought claims of breach of contract, unjust enrichment, and quantum meruit against both Defendants, Landmark Construction Company, Inc. ("Landmark") and Port City Concrete Inc. ("Port City"), for their alleged failure to pay UEA a placement fee. After limited jurisdictional discovery, Landmark and Port City Concrete have filed a renewed motion to dismiss based on lack of personal jurisdiction and failure to state a claim. For the reasons discussed below, this Court will grant Defendants' motion.

## II.    BACKGROUND

The following facts are alleged in the Second Amended Complaint.

### A.     The Contractual Dispute

Plaintiff UEA is a Pennsylvania limited liability corporation with its primary place of business in Emmaus, Pennsylvania. *See* Second Amended Complaint ("Am. Compl.") ¶ 1, ECF No. 8. UEA provides employment and contractor placement services to other businesses in exchange for a placement fee. *Id.* at ¶ 6. Defendants Landmark and Port City are both incorporated in South Carolina, *see* Motion to Dismiss 11, ECF No. 27, and both corporations have primary places of business in North Charleston, South Carolina, Am. Compl. ¶¶ 2, 3.

On October 18, 2019, Richard ("Rick") Mixson, as an agent of Port City, entered into a placement contract with UEA. *Id.* at ¶ 7; Ex. A ("Contract"), ECF No. 8-1. The contract provided that if the client company hires a candidate for full-time employment within eighteen months of initial introduction, the candidate is "conclusively presumed to be employed through the efforts of [UEA]" and the client company must pay UEA a placement fee equal to thirty percent of the candidate's projected first-year earnings. Contract at 1; Am. Compl. ¶¶ 6-7. The contract also contained a consent clause subjecting Port City to the jurisdiction of Pennsylvania Courts to enforce the terms of the agreement. Contract at 1. No parallel contract was entered into by UEA and Landmark.

Since October 2019, UEA performed placement services for both Defendants, but most often for Port City. Am. Compl. ¶¶ 12-17. On at least nine occasions, UEA was asked to find candidates for Port City. *Id.* at ¶ 13. From these requests, Port City made five permanent hires, *id.* at ¶ 15, and sent payment to UEA in Pennsylvania, *id.* at ¶ 17. On at least three occasions, UEA was asked to find applicants for Landmark, but it is unclear if any were hired. *Id.* at ¶ 12. In October 2021, Mixson requested candidate submissions for Landmark's Chief Operating Officer ("COO") position, stating that UEA had previously "done a great job" in finding placements for

Port City and Mixson wanted UEA to provide the "exact thing" for Landmark. *Id.* at ¶ 20. UEA took this to mean that any hires made by Landmark would be subject to the same terms set forth in the contract between UEA and Port City, as part of a "long standing course of dealing" between UEA and both Defendants. *Id.* at ¶ 12, 41. In November 2022, UEA put Mixson in contact with a candidate named Anthony Michael Garcia. *Id.* at ¶ 21. Mixson held an initial interview with Garcia and scheduled a second interview two months out, but Garcia informed UEA on January 5, 2023, that he would not be moving forward with Landmark, instead remaining with his current employer. *Id.* at ¶¶ 22-23 and Ex. E. ("Messages"). Two days later, Garcia told UEA that he had since communicated his disinterest in the Landmark position to Mixson. *Id.* at ¶ 24; Messages. In July 2023, however, UEA learned that Landmark had hired Garcia after he was placed there by a different, third-party placement entity. Am. Compl. ¶¶ 25-34.

UEA alleges that its placement contract with Port City was breached because UEA provided the initial introduction of Garcia to Landmark, and Garcia was hired for the position within eighteen months, thereby entitling UEA to the placement fee. *Id.* UEA requested full payment from Mixson (equivalent to thirty percent of Garcia's first year salary), but was denied, with Mixson instead offering to pay UEA one-third of the expected placement fee, explaining that the remainder was intended to be paid to the other third-party placement entity.[1] *Id.* at ¶ 30, 31. UEA brought this breach of contract action, claiming that Defendants intentionally—after arranging with UEA to recruit and place Garcia with Landmark— chose to retain a different

---

[1]     Landmark's contract with this other placement entity took effect on January 5, 2021, one day before Garcia notified Mixson he was uninterested in a position with Landmark, and two days prior to Garcia informing UEA that he would remain with his current employer. Am. Compl. at ¶¶ 24, 34; Messages at 1.

placement agency for the placement of the same candidate at a cheaper rate. *Id.* at ¶¶ 19-34 and Ex. D ¶¶ 2-4 ("Affidavit").

### B.    Landmark and Port City

UEA further asserts that the terms of the placement contract with Port City are enforceable against both Defendants, due to the companies' close relationship. Am. Compl. ¶ 38. Landmark and Port City are South Carolina corporations; each is incorporated in the state and has its primary place of business there. *Id.* at ¶¶ 2-3. The two corporations have common owners, siblings Rick and Cynthia Mixson, and share some other common employees. *Id.* at ¶¶ 3 n.2, 11, 28, 65. Both entities operate under the authority of Rick Mixson (hereafter "Mixson"), who is either a principal, actor, or representative for each entity. *Id.* at ¶¶ 3, 11 and Ex. B ("Emails") at 1; Contract at 1. Specifically, Mixson is listed as the registered agent of Port City and has signed contracts on its behalf, Am. Compl. ¶ 3; Contract at 1, while also routinely sending emails on behalf of Landmark, as its "President," via an email domain name belonging to Landmark. Emails at 4. Both Defendants appear to share a human resources department, Am. Compl. ¶ 11, and part of an accounting department. Response 8, ECF No. 28-1. In July 2021, the Manager of Human Resources, Jennifer Freeman, sent an email to UEA using a Landmark domain name, stating "I believe you are working with our President Rick Mixson on a General Manager role for our Ready Mix Concrete Company," all while listing Landmark's website in the signature block of her emails. Am. Compl. ¶ 11 n.3. The Employee Benefits Guides dating 2021 through 2023 for Port City and Landmark include the logos for both entities on the covers. *Id.* at ¶ 11 and Ex. C ("Benefits Guide") 8-9. The registered agents of both Landmark and Port City share a registered agent address in North Charleston, South Carolina, which is also Landmark's primary place of business. *Id.* at ¶ 2-3. Limited jurisdictional discovery also revealed that Landmark

previously loaned five hundred thousand dollars to Port City, and personally guaranteed some of Port City's loans, as part of an alleged pattern of financial support. *See* Response at 8, 16.

### C.    Procedural History

On September 21, 2023, this matter was removed from the Pennsylvania Court of Common Pleas of Lehigh County to the United States District Court for the Eastern District of Pennsylvania. *See* Notice of Removal, ECF No. 1.[2] As part of its Amended Complaint, UEA alleges that an alter ego relationship exists between Landmark and Port City which both validates this Court's exercise of personal jurisdiction over each entity and allows either to be held liable for breach of the placement contract. *See* Am. Compl. ¶¶ 45, 52, 65, 81, 83. On June 21, 2024, this Court entered an Opinion and Order dismissing Defendants' first Motion to Dismiss the Amended Complaint, without prejudice, and granting the parties limited jurisdictional discovery to establish whether this Court has personal jurisdiction over both Defendants. *See* ECF Nos. 23, 24. After limited discovery was conducted, on September 16, 2024, Defendants filed a Second Motion to Dismiss arguing lack of personal jurisdiction and failure to state a claim. *See* Motion to Dismiss, ECF No. 27. This motion is now ready for review.

---

[2]    Removal to federal district court does not constitute a waiver of a personal jurisdiction defense by the defendant nor indicate that the defendant has otherwise consented to personal jurisdiction. *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 131-32 (3d Cir. 2020) ("A party who removes an action from a state to a federal court does not thereby waive any of his or her Federal Rule 12(b) defenses or objections." (internal citations omitted)). *See also Rivera v. Bally's Park Place, Inc.*, 798 F. Supp. 2d 611, 615 (E.D. Pa. 2011) ("While a defendant can waive his objection to personal jurisdiction by failing to raise it in a timely manner . . . removal to federal court does not constitute such a waiver.") (citing *Arizona v. Manypenny*, 451 U.S. 232, 242 n.17 (1981)).

### III.    LEGAL STANDARDS

### A.    Motion to Dismiss under Rule 12(b)(2) – Review of Applicable Law

When reviewing a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), this Court must accept the plaintiff's allegations as true and resolve disputed facts in favor of the plaintiff. *Pinker v. Rocher Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). However, once a defendant has raised a jurisdictional defense, the plaintiff must "prov[e] by affidavits or other competent evidence that jurisdiction is proper." *See Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (internal citation omitted). If an evidentiary hearing is not held, a plaintiff "need only establish a prima facie case of personal jurisdiction." *Id*. A plaintiff meets this burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Provident Nat. Bank v. California Fed. Sav. & Loan Assoc.*, 819 F.2d 434 (3d. Cir 1987).

### i.    Personal Jurisdiction – Review of Applicable Law

To be subject to personal jurisdiction, a defendant's conduct in connection with the forum state must be such that he may "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). *General Electric Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001). Once challenged, "the burden rests upon the plaintiff to establish personal jurisdiction." *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). The plaintiff must establish "a nexus between the defendant, the forum and the litigation." *General Electric*, 270 F.3d at 150.

Personal jurisdiction may be either general or specific. General jurisdiction is based upon the defendant's  "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984). *General Electric*, 270 F.3d

at 150. *See also Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001); *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 n.3 (3d Cir. 1996). Specific jurisdiction is established when a non-resident defendant has "purposefully directed" his activities at the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *see also General Electric*, 270 F.3d at 150; *Dollar Sav. Bank v. First Sec. Bank of Utah, N.A.*, 746 F.2d 208 (3d Cir. 1984). The plaintiff's cause of action also must arise out of a defendant's forum-related activities. *General Electric*, 270 F.3d at 151 (quoting *Woodson*, 444 U.S. at 297); *see also Remick*, 238 F.3d at 255. Specific jurisdiction frequently depends on physical contacts with the forum, and questions of specific jurisdiction are properly tied to the particular claims asserted. *General Electric*, 270 F.3d at 150-51.

### ii.  Specific Jurisdiction in Contract Actions – Review of Applicable Law

In contract actions, federal courts have emphasized that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" should anticipate being subjected to regulation and sanctions in the other state for the consequences of their activities. *Burger King*, 471 U.S. at 473 (internal citation omitted). Courts are "not reluctant to find personal jurisdiction" in diverse contract cases, *see General Electric*, 270 F.3d at 150, because the cause of action could arise primarily from the nonresident defendant's contract with a forum resident, *Remick*, 238 F.3d at 256; *see, e.g., Mellon Bank*, 960 F.2d at 1222 (finding jurisdiction over nonresident defendant who solicited the contract or initiated the business relationship leading up to the contract with forum resident); *North Penn Gas v. Corning Natural Gas*, 897 F.2d 687, 690–91 (3d Cir. 1990) (finding jurisdiction over nonresident defendant who sent payments pursuant to the contract to the plaintiff in the forum state); *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 700 (3d Cir. 1990) (finding jurisdiction over

nonresident defendant who engaged in extensive post-sale contacts with the plaintiff in the forum

state). However, the existence of a contract between diverse parties, alone, cannot "automatically

establish sufficient minimum contacts in the other party's home forum," *Burger King*, 471 U.S.

at 478, and neither can "informational communications in furtherance of" a contract between

diverse parties, *Vetrotex*, 75 F.3d at 151 n.3.

The Third Circuit directs district courts to "inquire whether the defendant's contacts with

the forum were instrumental in either the formation of the contract or its breach." *General*

*Electric*, 270 F.3d at 150 (quoting *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d

284, 289 (1st Cir. 1999)). This restrictive standard is often referred to as "substantive relevance."

*Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124 (3d Cir. 2020) (citing

*O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 320 (3d Cir. 2007)). It directs courts to

look for a "substantial connection" or "discernible relationship" between the parties, to establish

purposeful contacts from which the plaintiff's claims may arise out of or relate to. *O'Connor*,

496 F.3d at 318, 320. Federal courts recognize "prior negotiations and contemplated future

consequences, along with the terms of the contract and the parties' actual course of dealing" as

evidence of such purposeful contact. *Burger King*, 471 U.S. at 479.

The Third Circuit has also observed that, while the "usual practice is to assess specific

jurisdiction on a claim by claim basis ... 'it may not be necessary to do so' for certain factually

overlapping claims." *See Quality Uptime Services v. Basis Systems Inc.*, 2024 WL 3239632, at

*6  (D.N.J. June 13, 2024) (declining to separately assess specific jurisdiction for an unjust

enrichment claim where it was already assessed for the primary breach of contract claim) (citing

*O'Connor*, 496 F.3d at 318; *Remick*, 238 F.3d at 255–56), *report and recommendation adopted*,

2024 WL 3226998 (D.N.J. June 28, 2024).

For this reason, the below assessment of specific jurisdiction with respect to UEA's breach of contract claims against both Defendants renders unnecessary any repeat assessment as to the unjust enrichment and quantum meruit claims, which were pled in the alternative.

### iii.  Alter Ego Theory – Review of Applicable Law

Liability under an alter ego theory is synonymous with the theory of piercing of the corporate veil. *See Lieberman v. Corporacion Experienca Unica, S.A.*, 226 F. Supp. 3d 451, 467–68 (E.D. Pa. 2016) (explaining that a plaintiff may "pierce the corporate veil through the 'alter ego' theory"); *see also Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 695 (Pa. Super. Ct. 1998) (same). Normally, a corporate entity shields its owners from personal liability for damages against the entity, but the protective veil of the entity may be set aside or pierced to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001).

A "party that seeks to pierce the corporate veil must show that the 'lack of [corporate] formalities led to some misuse of the corporate form.'" *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 509–10 (E.D. Pa. 2014) (quoting *Advanced Tel. Sys., Inc. v. Com-Net Pro. Mobile Radio, LLC*, 846 A.2d 1264, 1279 (Pa. Super. Ct. 2004)). When considering whether the corporate veil may be pierced, courts weigh the following factors: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud." *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995) (citing *Dep't of Env't Res. v. Peggs Run Coal Co.*, 423 A.2d 765 (1980)).

### a. Choice of Law Application for Jurisdictional Veil Piercing – Review of Applicable Law

The Court will make a threshold decision that veil piercing for jurisdictional purposes is *substantive* where, to retain personal jurisdiction over one defendant, as the alter ego of another, would mean subjecting that defendant to potential liability that it would not otherwise face.[3] This Court must then determine which state's substantive law applies. "In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits." *Amica Mutual Insurance Co. v. Fogel*, 656 F.3d 167, 170–71 (3d Cir. 2011), *as amended* (Dec. 9, 2011) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Since its 1964 opinion in *Griffith v. United Air Lines, Inc.*,[4] Pennsylvania has followed a "flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 403 (3d Cir. 2016) (quoting *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (1964)); *Hammersmith v. TIG Insurance Co.*, 480 F.3d 220, 227 (3d Cir. 2007); *see also Incubadora Mexicana, SA de CV v. Zoetis, Inc.*, 116 F.Supp.3d 519, 526 (E.D. Pa., 2015) (citing *Specialty Surfaces Int'l v. Cont'l Cas. Co.*, 609 F.3d 223, 239 (3d Cir. 2010)). While the Pennsylvania Supreme Court has yet to apply this flexible choice-of-law approach to contract claims, the Third Circuit has strongly suggested that it would so apply. *Auto-Owners Ins.*, 835 F.3d at 403 ("The *Griffith* court did not address whether its new flexible approach to choice-of-law questions would also apply to contract claims . . . . But we have, twice . . . we will continue to follow our previous prediction

---

[3]    *See* Sam F. Halabi, Veil-Piercing's Procedure, 67 Rutgers U.L. Rev. 1001, 1047-48 (2015) (explaining that federal district courts must "make a threshold decision as to whether veil-piercing is 'substantive' or 'procedural' for purposes of identifying applicable law").

[4]    In *Griffith v. United Air Lines Inc.,* the Pennsylvania Supreme Court abandoned the "lexi loci delicti" rule which required application of the law of the place where the injury occurred, and instead opted for a flexible approach that seeks to apply the law of the forum with the "most interest in the problem." 203 A.2d 796, 805-806 (1964).

and apply Griffith's flexible choice-of-law analysis"); *Hammersmith*, 480 F.3d at 228 ("[T]he

'spirit and weight of this Commonwealth's precedents mandate we follow the Griffith rule in the

contract law context.'") (quoting *Budtel Associates v. Continental Casualty Co.*, 915 A.2d 640,

644 (Pa. Super. Ct. 2006)); *Melville v. Am. Home Assur. Co.*, 584 F.2d 1306, 1312 (3d Cir. 1978)

("Because the [forms] were essentially contracts, we read Hunter as support for our prediction

that Pennsylvania will extend its Griffith methodology to contract actions.").

      Under the *Griffith* approach, a court must first determine if a conflict exists between the

laws of the competing states. *Auto-Owners Ins.*, 835 F.3d at 404. "If there are no relevant

differences between the laws of the two states, the court need not engage in further choice-of-law

analysis, and may instead refer to the states' laws interchangeably."[5] *Id. See also Pacific*

*Employers Ins. Co. v. Glob. Reinsurance Corp. of America*, 693 F.3d 417, 432 (3d Cir. 2012)

("If [the] two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law

analysis is unnecessary.") (quoting *Hammersmith*, 480 F.3d at 230).

---

[5]       Alternatively, if a conflict does exist because there are relevant differences between the laws of the competing states, Pennsylvania choice of law rules require the court to classify the conflict as "true," "false," or "unprovided for." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). If both jurisdictions' interests would be impaired by the application of the others' laws, a "true conflict" exists, and the court must apply the law of the state with the "greater interest in the application of its law." *Id.* at 231 (citing *Cipolla v. Shaposka*, 267 A.2d 854, 856 (1970)). If only one jurisdiction's interests would be impaired by the application of the other jurisdiction's laws, then a "false conflict" exists, and the court should "apply the law of the state whose interests would be harmed if its laws were not applied." *Id.* at 229-30 (distinguishing "false conflict" from "no conflict") (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir. 1991)). If neither state's interests would be impaired by the application of the others' laws, the conflict definition is "unprovided for." *Id.* at 227, 230 n.9. Courts differ on whether to apply the "law of the place of contract" (*lex loci contractus*) or the "law of the place of injury" (*lex loci delicti*) in unprovided-for cases. Compare *id.* at 230 n.9. (law of place of contract) with *Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 220 (3d Cir. 2005) and *Miller v. Gay*, 470 A.2d 1353, 1355–56 (1983) (law of place of injury).

Here, the parties dispute whether the substantive law of the forum state, Pennsylvania, or that of the state of Defendants' incorporation, South Carolina, applies. Each state's approach to veil piercing for closely related "sister" entities is outlined below.

### b. Pennsylvania's "Enterprise Liability" Theory – Review of Applicable Law

In 1998, the Pennsylvania Superior Court in *Miners, Inc. v. Alpine Equipment Corp.* tentatively acknowledged the "single entity theory," under which two corporations could be "treated as one because of identity of ownership, unified administrative control, similar or supplementary business functions, involuntary creditors, and insolvency." 722 A.2d at 695. This theory operates under the umbrella of alter ego doctrine and allows courts to evaluate the viability of a common enterprise claim brought against closely related "sister" corporations. *See In re Forks Specialty Metals Inc.*, 2023 WL 3239468, at *24 (Bankr. E.D. Pa. Apr. 30, 2023) (explaining the history and progression of single enterprise theory). In 2021, the Pennsylvania Supreme Court in *Mortimer v. McCool* cohesively molded the *Miners* framework, outlining an application of "enterprise liability" theory which can be summarized in a three-step test. 255 A.3d at 281-88 (Pa. 2021). A court evaluating a common enterprise claim under *Mortimer* must determine: (1) if there is substantially common ownership between the alleged alter-ego entities, and (2) if there is wrongdoing by the common owner and its entities, such that (3) triangular veil piercing is warranted. *See id.; see also In re Forks Specialty Metals*, 2023 WL 3239468, at *25 (summarizing the *Mortimer* test).

In this context, corporate "wrongdoing" can take many forms, but often represents some attempt by a corporate actor to exploit limited liability while failing to observe the separate identities of two or more corporations. *See In re Forks Specialty Metals*, 2023 WL 3239468, at *25. "Triangular veil piercing" aptly describes the triangular corporate structure between two

sibling entities and their common owner, and "requires a mechanism by which liability passes

through the common owner to the sibling corporation." *Mortimer*, 255 A.3d at 285; *see In re*

*Forks Specialty Metals*, 2023 WL 3239468, at *24 (explaining that enterprise liability is

triangular because it must "run up from the debtor corporation to the common owner, and from

there down to the targeted sister corporation"). This mechanism is a "reverse pierce," often

employed in cases where a "claimant against the owner of a corporation must establish the

owner's misuse of the corporate form to protect the owner's personal assets against some debt."

*Id.* In sum, the application of the *Mortimer* test depends on the existence of two things: corporate

wrongdoing, and a triangular corporate structure relating the sister entities. *See Mortimer*, 255

A.3d at 281-88.

### c. South Carolina's "Amalgamation" or "Single Business Enterprise" Theory – Review of Applicable Law

South Carolina takes a similar approach to Pennsylvania. Originally called

"amalgamation of interest," South Carolina's recently-dubbed "single business enterprise" theory

allows courts to recognize two entities as one where the corporations "have unified their business

operations and resources to achieve a common business purpose and where adherence to the

fiction of separate corporate identities would defeat justice." *Pertuis v. Front Roe Restaurants,*

*Inc.*, 817 S.E.2d 273, 279 (S.C. 2018). This theory serves to pierce the corporate veil of

companies that are "merely related, as opposed to piercing the corporate veil of a parent

company through a subsidiary company." *Duong v. N. Am. Transportation Services LLC*, 2019

WL 13109647, at *13 (D.S.C. Sept. 25, 2019). Similar to Pennsylvania's theory, South

Carolina's theory allows a "horizontal" pierce between sister entities, but only if there is "further

evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the

entities' legal distinctions." *Id.* at *13 (quoting *Pertuis*, 817 S.E.2d at 281). A mere showing that

the sister entities are intertwined is insufficient; there must be some abuse of the corporate form

to justify an alter ego classification under South Carolina law. *Id.*

### B.    Motion to Dismiss under Rule 12(b)(6) – Review of Applicable Law

Separately, Defendants argue that UEA's Second Amended Complaint should be

dismissed for failure to state a plausible claim. *See* Motion to Dismiss, at 1-2. In rendering a

decision on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), this Court must

"accept all factual allegations as true [and] construe the complaint in the light most favorable to

the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker*,

292 F.3d at 374 n.7) (internal quotation marks omitted). Only if the "[f]actual allegations . . .

raise a right to relief above the speculative level" has the plaintiff stated a plausible claim. *Id.* at

234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining

"whether a complaint states a plausible claim for relief . . . [is] a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense"). "[I]n light

of *Twombly*, Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to

relief. We caution that without some factual allegation in the complaint, a claimant cannot satisfy

the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the

claim rests." *Phillips*, 515 F.3d at 233 (citing *Twombly*, 550 U.S. at 555 n.3). *See also* Fed. R.

Civ. P. 8(a) (requiring the complaint to contain "a short and plain statement of the claim showing

that the pleader is entitled to relief"). "In deciding a Rule 12(b)(6) motion, a court must consider

only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Also, "a document integral to or explicitly relied upon in the complaint may be considered." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations omitted). The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### i.  Breach of Contract – Review of Applicable Law

A successful breach of contract claim requires that a plaintiff establish three things: (1) the existence of a contract; (2) the defendant breached a duty imposed by the contract; and (3) the plaintiff suffered damages as a result of the breach. *See Voltarelli v. Immaculata University*, 614 F. Supp. 3d 158, 163 (E.D. Pa. 2022) (citing *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (2010)); *Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002). "To satisfy the first element—the existence of a contract itself—a party must plead enough facts to demonstrate (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *Abdul-Rahman v. Chase Home Fin. Co., LLC*, No. CIV.A. 13-5320, 2014 WL 3408564, at *2 (E.D. Pa. July 11, 2014) (cleaned up). "It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F. 2d 291, 298 (3d Cir. 1986).

### ii.   Unjust Enrichment – Review of Applicable Law

A claim for unjust enrichment must establish the following elements: (1) benefits conferred upon defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Harry Miller Corp. v. Mancuso Chems. Ltd*., 469 F. Supp. 2d 303, 319 (E.D. Pa. 2007) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999)). "[T]he most significant element of the doctrine is whether the enrichment of the defendant is unjust. The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993). A "claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.'" *Torchia ex rel. Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. Ct. 1985) (quoting *Roman Mosaic & Tile Co. v. Vollrath*, 313 A.2d 305, 307 (Pa. Super. Ct. 1973)). *See also Whitaker v. Herr Foods, Inc*., 198 F. Supp. 3d 476, 492-93 (E.D. Pa. 2016). "[T]he essence of the doctrine of unjust enrichment is that there is no direct relationship between the parties." *Gee v. Eberle*, 420 A.2d 1050, 1060 (Pa. Super. Ct. 1980); *Benefit Tr. Life Ins. Co. v. Union Nat'l Bank*, 776 F.2d 1174, 1177 (3d Cir. 1985) (quoting *Gee*, 420 A.2d at 1060).

"A quasi contract, also referred to as a contract implied in law imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement when one party receives an unjust enrichment at the expense of another."[6] *Hershey Foods Corp.*

---

[6]     For clarification, this Opinion employs the oft-used terms "implied contract" to refer to a contract implied-in-fact, i.e., inferred from the conduct of the parties, *see Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004); *In re Penn. Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987), and "quasi contract" to refer to a contract implied-in-law as the result of unjust enrichment, *see, e.g., Hershey Foods*, 828 F.2d at 999.

*v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) (quoting *Birchwood Lakes Community Ass'n, Inc. v. Comis*, 442 A.2d 304, 308 (Pa. Super. 1982)). Accordingly, "unjust enrichment [is] inapplicable when the relationship between the parties is founded on a written agreement or express contract." *Hershey Foods*, 828 F.2d at 999 (quoting *Benefit Trust Life Ins. Co.*, 776 F.2d at 1177).

### iii.  Quantum Meruit – Review of Applicable Law

Under Pennsylvania state law, the terms "unjust enrichment" and "quantum meruit" are often used synonymously. *In re Atomica Design Group, Inc.*, 556 B.R. 125, 176 (Bankr. E.D. Pa. 2016) (citing *Goldsmith Assocs., Inc. v. Del Frisco's Rest. Grp., LLC*, 2009 WL 3172752, at *2 (E.D. Pa. Oct. 1, 2009) (quoting *Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co.*, 933 A.2d 664, 667 (Pa. Super. Ct. 2007))). "Quantum meruit is a quasi-contractual remedy in which a contract is implied-in-law under a theory of unjust enrichment." *Hershey Foods*, 828 F.2d at 998 (italics in original removed) (quoting *Ragnar Benson, Inc. v. Bethel Mart Associates*, 454 A.2d 599, 603 (Pa. Super. Ct. 1982)). *See Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1250 n.4 (Pa. 2016) (stating that a quantum meruit action "sounds in quasi-contract or contract implied in law," and seeks restitution from those "unjustly enriched by the services of another"). Quantum meruit will not be awarded when there is an express agreement because the contract "fixes the value of the services involved," so there can be no recovery under a quantum meruit theory. *Hershey Foods*, 828 F.2d at 999 (quoting *Murphy v. Haws & Burke*, 344 A.2d 543, 546 (Pa. Super. Ct. 1975)). A quantum meruit claim pled together with an unjust enrichment claim is therefore tied to it, because where unjust enrichment is found, the law implies a quasi-contract which "requires that the defendant pay the

plaintiff the value of the benefits conferred, i.e. that the defendant make restitution to the plaintiff in quantum meruit." *Styer*, 619 A.2d at 350.

## IV.    DISCUSSION

### A.  This Court has specific personal jurisdiction over Port City only.

UEA alleges that Port City and Landmark have sufficient minimum contacts with Pennsylvania such that this Court can exercise specific jurisdiction over both, and alternatively, if Landmark's contacts are insufficient, it can nonetheless be subjected to personal jurisdiction as the alter ego of Port City.[7] This Court agrees with UEA that Port City has sufficient contacts with the forum state but disagrees that Landmark has sufficient contacts or is an alter ego of its sister corporation.

---

[7]     This Court's prior Opinion in this matter, dated June 21, 2024, found there was a *prima facie* showing of alter ego sufficient enough to warrant limited jurisdictional discovery. *See* ECF No. 23. That Opinion applied a ten-factor test designed "to determine whether a subsidiary is the alter ego of the parent." *Lutz v. Rakuten, Inc.*, 376 F. Supp. 3d 455, 471 (E.D. Pa. 2019) This Court, having read all of the pleadings in support and opposition to Defendants' Renewed Motion to Dismiss (filed *after* limited discovery), now finds that the Defendants are not in a parent/subsidiary relationship but a close relationship between "sister" entities. The analysis in this Court's June 2024 Opinion was premised on the existence of a traditional parent-subsidiary alter ego relationship, which is largely dependent on one entity's control over the other. *See Fuhrman v. Mawyer*, 2023 WL 5672314, at *7 (M.D. Pa. Sept. 1, 2023) ("[I]f a subsidiary is merely the agent of a parent corporation, or if the parent corporation otherwise 'controls' the subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction . . . exists over the subsidiary") (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018)). That analysis remains correct, as it was conducted for the limited purpose of determining whether, on its face, the Second Amended Complaint stated a sufficient alter ego claim to warrant this Court's grant of limited jurisdictional discovery. The June 2024 Opinion, however, reserved a final determination of personal jurisdiction for after the parties conducted limited discovery, which has since occurred. A close relationship between the entities has been revealed, but this Court finds that relationship is not one of control. Accordingly, the substantive law applied in Section IV(A)(ii), *infra*, is that which pertains to alter ego relationships between closely related sister entities.

### i. Only Port City has purposeful minimum contacts.

To determine if specific jurisdiction exists, this Court must look for purposeful direction of a defendant's forum-related activities, from which the plaintiff's cause of action may arise. *See Burger King*, 471 U.S. at 472; *Woodson*, 444 U.S. at 297; *General Electric*, 270 F.3d at 150. An express contract between diverse parties, while informative, *see Remick*, 238 F.3d at 256, is not dispositive to a jurisdictional determination, *see Burger King*, 471 U.S. at 478. Instead, this Court must consider all past, present, and future contacts, along with the terms of a contract, if any, *see id.* at 479, to determine if purposeful contacts exist and if they were instrumental in the formation or breach of the contract at issue, *General Electric*, 270 F.3d at 150.

Here, UEA references a "long standing course of dealing" with Landmark but acknowledges that no written contract between the two was ever formed. *See* Am. Compl. ¶ 18. As evidence of a preexisting business relationship, UEA alleges that "Defendants" requested that UEA find candidates for Landmark on at least three prior occasions, on or about July 2021, November 2021, and October 2022, for three separate positions. *Id.* at ¶¶ 12, 14. However, no allegations were made that Landmark contacted UEA beyond these initial requests, made any hires from these introductions, or attempted to follow up with UEA afterwards to ensure that these positions were eventually filled. *See id.*, ¶ 15 (stating that only Port City made hires from *its* introductions). UEA alleges only that in October 2021, Landmark President Rick Mixson requested that UEA find a candidate for Landmark's COO position. *Id.* at ¶¶ 19-20. In November 2022, UEA introduced a COO candidate, Garcia, to Landmark with the expectation that this "course of dealing established an agreement between UEA and [Landmark]" such that "any placement made to [Landmark] by UEA would be at the terms set forth in the Placement Contract" between UEA and Port City. *Id.* at ¶¶ 18, 21. From November 2022 to July 2023, all

contacts regarding the Landmark COO placement were between UEA and Garcia only, in which Garcia updated UEA via LinkedIn on the progress of his interviews with Landmark, and his later decision not to pursue the role. *Id.* at ¶¶ 22-24. After the introduction of Garcia in Fall 2022, the only alleged contact between UEA and any representative of Landmark took place in Summer 2023, where *UEA contacted Landmark* to acknowledge Landmark's recent hiring of Garcia, and to request payment of the placement fee outlined in the contract between UEA and Port City. *Id.* at ¶¶ 27-29.

This Court is not convinced of a "long standing" business relationship between Landmark and UEA, nor is it convinced that Landmark's few contacts to UEA in Pennsylvania (each an email request for a candidate search, with seemingly no follow-up) constitute purposeful direction at the forum state. *See Burger King*, 471 U.S. at 472; *General Electric*, 270 F.3d at 150; *Dollar Sav. Bank*, 746 F.2d at 212-14. No allegation is made that a representative from Landmark was ever physically present in Pennsylvania, nor that any of Garcia's interviews were conducted in person in Pennsylvania or virtually while Garcia was in Pennsylvania. *Accord Penco Products, Inc. v. WEC Manufacturing, LLC*, 974 F. Supp. 2d 740 (E.D. Pa. 2013) (finding sufficient contacts where defendant called and emailed plaintiff's Pennsylvania-based employees daily and frequented the state to discuss the contract and conduct business); *General Electric*, 270 F.3d at 152 (finding sufficient contacts where defendant physically visited Pennsylvania several times to conduct business with plaintiff and to fulfill obligations pursuant to their agreement). There is no express written contract between UEA and Landmark and no indication that Landmark agreed to be bound by the terms of the contract between UEA and Port City. It is not alleged that Mixson, who expressly signed the placement contract as a representative of Port City, *see* Contract at 1, also intended his signature to bind Landmark to its terms, including

subjection to the jurisdiction of Pennsylvania Courts. *Accord Numeric Analytics, LLC v. McCabe*, 161 F. Supp. 3d 348 (E.D. Pa. 2016) (finding sufficient contacts where defendant signed an agreement which had a Pennsylvania choice of law clause and mandated that defendant direct certain contacts to Pennsylvania). This Court rejects the notion that the few contacts by Landmark were at all instrumental in the formation or breach of a contract between Landmark and UEA. *Accord E&H Conveyors, Inc. v. New Horizons Eq. Funding, LLC*, 484 F. Supp. 3d 229 (E.D. Pa. 2020) (finding sufficient contacts where defendant's contacts with Pennsylvania-based plaintiffs were essential to the formation of a contract). Accordingly, this Court finds that it does not have personal jurisdiction over Landmark.

By contrast, Port City has established a preexisting and ongoing business relationship with UEA and has since maintained contacts directed at the forum state of Pennsylvania. The Third Circuit has found there to be sufficient contacts "where the defendant solicited the contract or initiated the business relationship leading up to the contract . . . sent any payments to the plaintiff in the forum state, or where the defendant engaged in extensive post-sale contacts with the plaintiff in the forum state." *Remick*, 238 F.3d at 256 (quoting *Vetrotex*, 75 F.3d at 152). Here, Port City has made all necessary contacts short of physically visiting the forum. In October 2019, Port City signed a placement contract with UEA and sent it's signed version to UEA's Pennsylvania business address. Am. Compl. ¶ 6. This contract has a choice of law clause under which Port City "acknowledges the jurisdiction of Pennsylvania courts to enforce the terms of this Agreement." Contract at 1. Since entering the contract, Port City has made upwards of nine placement requests of UEA over the years, resulting in at least five hires. Am. Compl. ¶¶ 9, 15. Port City then sent payment for each of these hires, in accordance with the terms of the placement contract, to UEA at either its Pennsylvania business address or at a bank address in

Pennsylvania with which UEA is affiliated. *Id.* at ¶ 17. This Court is convinced that "the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, [and] the course of dealings" between Port City and UEA establish a clear business relationship. *Mellon Bank*, 960 F.2d at 1223. Moreover, this Court finds that Port City's initial (and ongoing) solicitation of services from UEA was essential to the formation of a contract between the two. *See General Electric*, 270 F.3d at 150; *E&H Conveyors,* 484 F. Supp. 3d at 236-37 (finding sufficient contacts where defendant's communications with Pennsylvania-based plaintiffs were essential to the formation of the contract). Since it is not "necessary" to assess specific jurisdiction for "factually overlapping claims," *see O'Connor*, 496 F.3d at 318; *Remick*, 238 F.3d at 255–56, this Court declines to repeat its specific jurisdiction determination for UEA's claims of unjust enrichment and quantum meruit, which were pled in the alternative. This Court finds that it has personal jurisdiction over Port City only.

### ii. UEA has not shown corporate wrongdoing sufficient to warrant a jurisdictional veil pierce.

Still, UEA correctly points out that this Court has before held that "[w]here an individual or a corporation has insufficient contacts with the forum state to satisfy due process, a court may nonetheless exercise personal jurisdiction if the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction before that court." *Davlyn Mfg. Co., Inc. v. H&M Auto Parts, Inc.*, 414 F. Supp. 2d 523, 531 (E.D. Pa. 2005). Thus, even if only Port City has sufficient minimum contacts to establish personal jurisdiction, this Court may nonetheless choose to exert jurisdiction over Landmark if UEA establishes that the two are alter egos.[8] Since this Court presently sits in diversity in Pennsylvania, this state's choice

_____

[8]     This Court and its sister districts have before held that the jurisdictional analysis for alleged alter egos is "a less onerous standard" than piercing the corporate veil for liability purposes; a court need only find that the corporation was a "shell entity" to prove alter ego for

of law rules apply. *See Amica Mutual Insurance*, 656 F.3d at 170–71 (citing *Klaxon*, 313 U.S. at 496). Pennsylvania's "flexible rule" under *Griffith* depends first on whether a conflict between the laws of the competing states even exists. *See Auto-Owners Ins.*, 835 F.3d at 404. This Court finds no meaningful difference between the "enterprise liability" theory of the forum state of Pennsylvania, and the "single enterprise" theory of Defendants' state of incorporation, South Carolina. Resultantly, no further choice of law analysis is needed, and the two states' laws will be referred to interchangeably. *Id.*

Both Pennsylvania and South Carolina recognize the need for a veil pierce when two closely related sister corporations fail to observe corporate separateness, thereby perpetuating a fraud or corporate wrong. Here, Landmark and Port City are undoubtedly closely related, but this does not necessarily indicate wrongdoing. The two corporations have common ownership and employees, including Rick and Cynthia Mixson, Jennifer Freeman, and other human resources and accounting personnel. Am. Compl. ¶¶ 3 n.2, 11, 28, 65; Contract at 1; Emails at 1; Reply Brief at 8, ECF No. 29. As sister entities, Landmark and Port City have a largely informal business relationship, due in part to their common ownership by two adult siblings. Am. Compl. ¶ 3 n.2. Naturally, several commonalities present.

Both companies occasionally work together to service projects for clients, sharing costs and labor, particularly when one company lacks the necessary number of industrial workers to supply a crew. *See* Response, Ex. B ("Rick Deposition") at 2. Port City pays Landmark monthly

---

jurisdictional purposes, regardless of any finding of fraud. *Sugartown Worldwide LLC v. Shanks*, 129 F.Supp.3d 201, 205-06 (E.D. Pa., 2015) (citing *Bell v. Fairmont Raffles Hotel Int'l, et al.*, No. 12–757, 2013 WL 6175717, *3 (W.D. Pa. Nov. 25, 2013)). However, these cases involved parent-subsidiary relationships rather than closely related sibling entities, which may often be closely related absent any corporate wrongdoing. *See id.* Though this Court also seeks to determine whether jurisdictional veil piercing is warranted, its application of single/enterprise liability theory is appropriate where a "horizontal" or "triangular" veil pierce may result.

in exchange for human resource and accounting services as well as additional labor when needed. *Id.* The same Employee Benefits Guide is used for employees of Landmark and Port City. Am. Compl. ¶ 11; Benefits Guide at 8-9. The registered agents for both entities share the same address as Landmark's primary place of business. Am. Compl. ¶ 2-3. Director, shareholder, and board meetings occur irregularly, and meeting minutes are infrequently taken due to the informal nature in which the owners meet. Response, Ex. D ("Cynthia Deposition") at 3. UEA also highlights, from its limited discovery findings, the fact that Landmark made a five hundred-thousand-dollar loan with no known maturity or interest rate to Port City and has personally guaranteed several of Port City's other loans. Response at 11.

This Court takes no issue with harmonies existing between sister corporations, including the existence of a well-documented loan, given interest-free as perhaps a gesture of good faith or in anticipation of future services. Whether this Court agrees with Landmark's corporate ownership structure or financial decisions is of no consequence to an alter ego determination, so long as these operations and transactions are not made for improper purposes. At most, UEA has alleged that Defendants operate two parallel businesses in a disorganized fashion. At a minimum, UEA has shown that each business occasionally pays for the use of the other's resources and services. These facts are not themselves evidence of commingling or corporate wrongdoing. Without a showing of wrongdoing, no alter ego status can be found under Pennsylvania or South Carolina law.

Having accepted UEA's alleged facts as true, this Court finds that Landmark and Port City are not alter egos for the sake of establishing personal jurisdiction over Landmark. Defendants have mounted a jurisdictional defense, and UEA has failed to "prov[e] by affidavits or other competent evidence that jurisdiction is proper" over Landmark under an alter ego

theory. *See Metcalfe*, 566 F.3d at 330 (internal citation omitted). This Court has personal jurisdiction over Port City only, and all claims against Landmark must be dismissed for lack of jurisdiction.[9]

### B.  UEA has failed to state a plausible claim against Port City.

This Court now must determine if the remaining claims against Port City fail to state a claim on which relief can be granted. Again, this Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips*, 515 F.3d at 233 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Here, UEA has pled insufficient facts to state a plausible claim against Port City for breach of contract, unjust enrichment, or quantum meruit.

### i.  There is no plausible claim that Port City breached its placement contract.

UEA must establish three things to state a plausible claim for contract breach (count two): (1) the existence of a contract; (2) the defendant breached the contract; and (3) the plaintiff suffered damages as a result. *See Voltarelli*, 614 F. Supp. 3d at 163 (citing *McShea*, 995 A.2d at 340); *Gorski*, 812 A.2d at 692. Here, UEA has provided evidence that Port City signed a placement contract with UEA in October 2019. *See* Contract at 1. The placement contract itself requires that the "client company" pay, in accordance with UEA policy, a fee equal to thirty percent of the candidate's first year salary, if hired within eighteen months of first introduction by UEA. *See* Contract at 1. The contract contains general language and is not customized to Port City. *See id.* The same fee schedule could be presented to any client company of UEA. However, Mixson's signature appears at the bottom, atop a signature line bearing the following print:

---

[9]       This serves to dismiss counts one, three, and five of the Second Amended Complaint.

Rick Mixson
Port City Concrete

*See* Contract at 1.

Mixson's signature binds Port City as a party to this placement contract and covers future placements made by UEA to fill Port City positions. There are insufficient facts from which it would be reasonable to assume that the same signature, made as a representative of "Port City Concrete," served to bind any other corporation or to cover future placements made by UEA to any other corporation. This Court therefore finds that Port City's duty to pay, as outlined by the placement contract, is limited to UEA placements of Port City employees.

In count two of the Second Amended Complaint, UEA claims that Port City failed to pay the placement fee for Landmark's hiring of Garcia, which occurred within eighteen months of initial introduction by UEA. Am. Compl. ¶¶ 48-54. Taking UEA's allegations as true, this Court finds that UEA provided the initial introduction of Garcia, and that Garcia was hired within eighteen months, all in accordance with plain language of the contract. *Id.* at ¶¶ 21-22, 27; Contract at 1. However, Garcia was introduced to and hired by Landmark, not Port City. Am. Compl. ¶¶ 21-22, 27. Landmark is not a party to the placement contract. *See* Contract at 1. The contract, on its face, neither contemplates a duty of Port City to pay for a placement to its sister corporation, nor anticipates circumstances in which a placement for Landmark would be considered a placement for Port City. *See id.* In defense of its argument, UEA only prompts this Court to consider that the two companies could be alter egos, with which this Court does not agree. As stated above, this Court does not have jurisdiction over Landmark and is not convinced that the two companies are so interrelated that a COO at Landmark would effectively be an employee of Port City. *See supra*, Section IV(A)(ii). As a result, UEA has failed to plead facts sufficient to show that Port City breached any of its duties to UEA under the placement contract.

*Iqbal*, 556 U.S. at 678 (finding that a breach of contract claim must establish that the defendant "is liable for the misconduct alleged"). Accordingly, this Court finds that UEA has failed to state a plausible claim for breach of contract against Port City.

> **ii.   There is no plausible claim of unjust enrichment or quantum meruit against Port City because there are insufficient allegations of a quasi contract implied-in-law.**

A quasi contract imposes a duty in spite of the absence of an agreement when one party receives an unjust enrichment at the expense of another. *Hershey Foods*, 828 F.2d at 999 (citing *Birchwood Lakes Community Ass'n*, 442 A.2d at 308). Under Pennsylvania law, the "doctrine of unjust enrichment [is] inapplicable when the relationship between the parties is founded on a written agreement or express contract." *Hershey Foods*, 828 F.2d at 999 (quoting *Benefit Trust Life Ins. Co.*, 776 F.2d at 1177). However, the Federal Rules of Civil Procedure permit such claims to be pled in the alternative if "the existence or applicability of a contract is in dispute." *Hickey v. U. of Pittsburgh*, 81 F.4th 301, 316 (3d Cir. 2023) (referencing Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.")). Here, UEA pleads unjust enrichment in the alternative to breach of contract because the parties dispute whether the placement contract establishes a duty by Port City to pay for placements at Landmark.

UEA claims that Port City "has been and will be further unjustly enriched if permitted to utilize UEA's services without compensating UEA for the use of UEA's services." Am. Compl. ¶ 70. The unjust enrichment complained of (count four) is the hiring of Garcia by Landmark. UEA suggests that a candidate hired "for the benefit of" Landmark "confer[s] by extension a benefit upon [Port City]." *Id.* at ¶¶ 65, 81. This suggestion, however, depends on this Court finding that Landmark and Port City are alter egos, *see id.*, which they are not, *see* Section

IV(A)(ii), *supra*. Thus, to the extent a written contract exists between UEA and Port City, it does not impose on Port City any express duty to pay for placements at Landmark. *See* Contract at 1. If a written contract did exist which contemplated this duty, the unjust enrichment claim against Port City still would fail as a matter of law. *Hershey Foods*, 828 F.2d at 999 (finding that unjust enrichment is inapplicable when the relationship between the parties is founded on an express contract written agreement). Moreover, if an implied contract existed which contemplated this duty, the unjust enrichment claim would still fail as a matter of law. *Id.* (explaining that it is in the absence of any express or implied agreement that a duty is created as a result of unjust enrichment).

This Court also does not find sufficient allegations in the Amended Complaint to establish the existence of an implied-in-law (quasi) contract obligating Port City to pay for Landmark's placements. To the extent that there is no agreement which contemplates this duty, still no allegations have been made, beyond the conclusory assertion of a benefit "confer[ed] by extension" upon Port City, Am. Compl. ¶¶ 65, 81, that Landmark's hiring of Garcia served to confer an actual benefit upon Port City, which Port City then accepted and retained under conditions meriting repayment, *see Harry Miller Corp.*, 469 F. Supp. 2d at 319. Therefore, the first element of unjust enrichment, showing that a benefit was conferred on the defendant by the plaintiff, is not sufficiently pled. *See Harry Miller Corp.*, 469 F. Supp. 2d at 319 (reviewing the elements of unjust enrichment). UEA fails to state a claim for unjust enrichment.

UEA also fails to properly plead a claim of quantum meruit (count six) against Port City because the express contract between UEA and Port City "fixes the value of the services involved." *Hershey Foods*, 828 F.2d at 999 (quoting *Murphy*, 344 A.2d at 546). There is no allegation that an implied contract between UEA and Port City otherwise exists which would

impose on Port City a duty to pay for Landmark's placements, nor any allegation that a benefit was conferred to Port City under a quasi-contract such that UEA is owed payment in quantum meruit. *See Styer*, 619 A.2d at 350. UEA has therefore failed to state a claim against Port City for unjust enrichment and quantum meruit. This Court cannot grant relief on either basis.

### iii.  Leave to amend is warranted only for counts four and six against Port City.

Courts should grant leave to amend a complaint freely "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "the policy favoring liberal amendments is not 'unbounded.'" *Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 224 (E.D. Pa. 2012) (citing *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990)). For example, a court need not grant leave to amend when an amendment would be futile. *See id.* An amendment is futile if the "amendment would not withstand a motion to dismiss." *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 125 (3d Cir. 1983). Courts therefore assess whether an amendment would be futile under the same legal standard used when adjudicating a motion to dismiss under Rule 12(b)(6).

This Court lacks personal jurisdiction over Landmark so leave to amend the claims against Landmark would be futile. An amended complaint, if permitted, would have to state a plausible claim against Port City. In dismissing the breach of contract claim, this Court explained that the contract was between UEA and Port City and is limited to UEA placements of Port City employees. Because the alleged breach pertains to the failure of Port City to pay UEA for the placement of a Landmark employee, no additional allegations could state a claim for breach of contract. Leave to amend this claim (count two) would therefore be futile. However, given the lack of sufficient factual allegations in support of a quasi-contract or a benefit conferred on Port City, this Court is unable to conclude that leave to amend the remaining claims against Port City, which are based on the existence of a quasi-contract, would be futile. This Court questions

whether it can be plausibly alleged that an unjust benefit was conferred upon Port City by Landmark's COO placement, particularly after this Court found no alter ego relationship, but it cannot deny that possibility. Leave to amend is granted only with respect to counts four and six against Port City.

## V.    CONCLUSION

For the reasons discussed, Defendants' Renewed Motion to Dismiss for lack of personal jurisdiction and failure to state a claim is granted. Defendant Landmark Construction Company, Inc. is dismissed from this action, and all claims against Landmark are dismissed with prejudice. Count two against Port City Concrete, Inc., for breach of contract, is dismissed with prejudice for failure to state a claim. The remaining claims against Port City, namely counts four and six of UEA's Second Amended Complaint, are dismissed without prejudice for failure to state a claim. UEA is granted leave to amend only with respect to its unjust enrichment and quantum meruit claims against Port City. A separate Order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge